Good afternoon, Your Honors. Good afternoon. May it please the Court. Michael Connealy on behalf of the defendants. If I may, I'd like to reserve three minutes for rebuttal. Of course. This Rule 23-F appeal presents a narrow but important question of class action law. Whether plaintiffs' alleged injuries from investing in seven retirement plan options permit them to represent a class of investors who were allegedly injured by 30 different investments. Excuse me. Is the thrust of the claim as you understand it the flawed fund selection and monitoring process, or is it the imprudent investments in each fund? With respect to the issue in the 23-F petition, I understand the thrust of the claim to be the imprudent inclusion of the plan options, the investment options. And there are two elements to such a claim under Third Circuit case law, including this Court's decision in Renfro and the In Re Unisys Savings Plan litigation. And in those two cases, the Court recognized that there are two elements here. One is a deficient fiduciary process, which goes to, Your Honors, your first category. And the second is whether the investments are objectively imprudent. And that's because you can have the worst process in the world and yet still produce good results. If so, there cannot be liability under ERISA for that. And so that's why we have argued that there cannot be a claim based solely on the fiduciary's investment process. But that is the basis for the class certification order below. I would say that the best case from the class action perspective on whether when and whether a common course of conduct is enough to justify a typicality finding, from our point of view, is Danvers Motor Company versus Ford Motor Company, where the Court had in front of it a plaintiff who was saying there's a company-wide program, the Blue Oval Program that Ford Motors had for its dealers. And our claim is that that program is unlawful under state and federal law. Well, what the Court did was it didn't just rely on the allegation. It looked at the substance of the claim and the nature of the allegations and concluded that the plaintiffs there were actually challenging a variety of different actions that Ford took under the auspices of their program. Well, so to here, what we have are 37 different options, and the fiduciaries need to ensure that each of those 37 options is prudent and appropriate for inclusion in the fund. And to prove that they failed in ensuring those options prudence, we would need fund-by-fund evidence about what the fees were for these options, what their returns were, and how that could compare with a potential alternative investment that the plaintiffs say they should have included. What I'm trying to think through is what's the theoretical flaw, right? Because if you take a step back and you say, our complaint is, as it's stated, the uniform course of conduct, right? At least theoretically, that should be a claim that could be stated, right? I understand that you might say, well, there'll be different proofs, but that's not important ab initio, right? I mean, initially, I should be able to articulate a claim that in these 37 funds, the way that the company went about the process of selection, the process of going about and putting money in and, you know, when to go in, et cetera, et cetera, right, was flawed. We could probably agree that that'd be tough to prove, but why, on a theoretical basis, shouldn't the plaintiffs have at least the opportunity to go forward? Well, and that's why I think the cases that I cited earlier, the Renfro case and the Unisys case, are very instructive, because in those cases, the court cited the concurring opinion of then Circuit Judge Scalia in the Fink case, and he threw out the hypothetical, well, what if you have a fiduciary that has not investigated the plan options at all, but it so happens, whether by luck or otherwise, that these plan options have ended up being good ones? And he said in that case, and this court then agreed in those other cases, that that would not be the basis for ERISA liability. And that makes sense. If you end up with perfectly flawed, perfect investment options just through dumb luck, that doesn't create the kind of harm or loss that could be the basis for a fiduciary breach claim. And so that's why we say here that you have to look at the actual substance of the allegations. And I think even in the complaint here, you'll see that there is a comparison between the allegedly plaintiff's say should have been included instead. And that's part of being able to survive a 12B6 motion in these kinds of cases. There need to be those kinds of factual allegations in the complaint rather than just a conclusory claim that the fiduciary process itself was flawed. And I think it's not helpful in some ways to step out of ERISA for a moment and think about how this kind of course of conduct argument would fare in a different kind of class action. So, for instance, a products liability class action. You could easily imagine a plaintiff saying that this carmaker had a deficient, a flawed quality control process. And that's why I suffered a leaky sunroof. But it's also why other members of the proposed class suffered defective brake systems or, you know, flawed airbags. Well, we wouldn't think of those as being the same claims or that the sunroof claims are typical of brake failure claims just because they could somehow be tied or tied back to a flawed process. A flawed quality control process may be responsible in some abstract way, but those are still separate injuries. And just the same here. An injury from investing in an imprudent intermediate term bond fund is very different from an injury that comes from investing in an imprudent international equity fund. Well, let's just press on that point for a moment, right? So, at least from a theoretical basis, there is no difference, right? Because if the selection process is flawed and it leads to an injury, I mean, I know they don't allege a specific injury, but a general injury, why isn't that something that can at least, you know, for Rule 23 purposes, allow the class as asserted to go forward? Well, I think it's because the standard of care that's imposed on fiduciaries by RISA is to operate the same way that a prudent man would conducting an enterprise of like aims and character. And so that inherently requires, and courts in the 12 to 6 context in RISA cases have said, you need to look at a meaningful comparison for the allegedly imprudent fund. You can't compare apples and oranges. And as a result, then at trial, the plaintiffs would need to show that, you know, the diversity, I'm sorry, the diversified international fund K-class is actually validly compared to whatever alternative they say should have been presented. And the problem with the typicality is that they don't have a concrete stake in putting on such proof for investments that they never, and I mean the named plaintiffs, not class counsel, but the named plaintiffs don't have a concrete stake in presenting that proof. Well, you mentioned typicality a moment ago. At least in my thinking, and you'll tell me why I'm wrong, I tend to think of in this context standing in typicality as being somewhat similar, and at least for analytical purposes that we have before us. So I think about cases like Hawksworth and Prudential, and I say, okay, the numbers are a little different here. It's 7 funds they're in, 30 funds they're not. But Hawksworth, it's 15 funds they're in, 6 they're not. Prudential, I don't remember the numbers, but some they're in, some they're not. So what's the difference? Number one, I understand those typicality cases, so I say that up front. But number one, why aren't we bound by those cases? Obviously POs are cases. And if you believe we're not bound, how should we be thinking about the numbers? You have stark numbers, right? You're like, 30 they're not, 7 they are. Okay, that's stark. But how should we be thinking about this? Because clearly we lent our imprimatur to Hawksworth. Well, I think nothing we're arguing is inconsistent with Hawksworth or Prudential. In those cases, that wrongful conduct alleged was a deceptive scheme. And there, you can imagine, a defendant who is saying the same falsehood about all sorts of different investments at the same time is really engaged in a uniform course of conduct. But that's why I pointed to the Danvers Motor Company case, because that applied Hawksworth in the progeny case law and says you have to actually dig into the allegations and the nature of these claims. And I think when you do that in the ERISA context with these claims, you see that fund-specific proof is necessary and the typicality requirement is not met. And I think that the Seventh Circuit's decision in Spano v. Boeing really saw through the core of this issue. And it's the only appellate court decision from any circuit that addresses the typicality argument we're making here. And it says that at a minimum, plaintiffs and the class need to have invested in the same investment option. That's the Seventh Circuit case that we cited. I see I'm running low on time. Don't worry about time. Your time is my time. My time is your time. I wanted you to talk about Fallick, because I thought Fallick was instructive, and we can get back to Spano in a moment. So in the Fallick case, that was a welfare plan case where the plaintiffs were trying to sue on behalf of a bunch of different welfare plans, not a retirement plan case. And the reason why typicality was present there is actually very similar to the Hawksworth and prudential case, because the wrongful conduct was the application of a benefits-calculating methodology that was uniform across all of the plans. And that's why we're not advocating a sort of categorical rule that you can only ever represent people in your own plan, but for the nature of these types of claims, as pleaded in the complaint, where we're really seeing whether particular investment options gave you enough bang for your buck to be considered prudent ones and worthy of inclusion, that's where you have to engage in that sort of fund-by-fund. It's not just a course of conduct. It's actually 37 different things, keeping those funds in the plan or putting them in the first place, that's being challenged. So you can't decide this case on the merits, or at least on the typicality grounds, on class certification, unless you can back up the selection process with funds that are not producing. I think that's right, Your Honor. Our position is that the typicality is absent because you need that fund-specific evidence of insufficient performance given the expenses charged, and plaintiffs only have a concrete stake in making that showing for the funds they invest in. How important is your incentive argument to your overall argument here? Do you think that's really a problem in this case? Well, I would distinguish between two different incentives. The class counsel, I think, have incentives to maximize recovery. I'm not disputing that. But what is missing is the named plaintiff's incentive to prove the imprudence of options that they did not select. And the First and Second Circuit cases that we cite from the residential mortgage-backed securities cases, the plumber's union case and the retirement fund case, are very good on this point. They say, in order for... Those are standing cases, but as Judge McGreenaway noted, they're kind of similar arguments at the end of the day. What is missing and what is necessary is some assurance that the plaintiffs themselves, the named plaintiffs, and not just their counsel, have adequate incentives to provide proof that would prove all of the class's claims. And that's especially important here where you're in a mandatory Rule 23b-1 class action where there's no right to opt out on the part of absent class members. And so I think the incentives argument is important. But I don't think it's our only argument. And we also have the full and standing argument, which is less about incentives, at least on the surface, although it kind of gets at the same core question, whether the plaintiffs themselves have a concrete stake in the outcome of the class's claims. In full, that was a defined benefit,  That's correct, Your Honor. Right, in full, I thought the whole thing kind of focused on the fact that Full and Smith knew what they were getting, right? They had a defined benefit. And throughout the period that they were complaining about, they were receiving their benefit. But that's not what the claim is here, right? This is a contribution plan. That's certainly correct, Your Honor. But the key test that Thole applied is the same one we're advocating for here, which is, for Article III purposes, the plaintiff needs to have a penny more, at least, or a penny less of benefits of their own at stake. And in a defined benefit plan kind of case, as Your Honor mentioned, that's a very easy thing to figure out because the benefits aren't tied to the plan assets, they're tied to whatever contractual arrangement there is. And that's not true in a defined contribution plan case. But by definition, and this is in 29 U.S.C. 1002 paragraph 34, a defined contribution plan is defined as one where the participant's benefits are based solely upon the amounts in their own account. And so when you apply the definition of defined contribution plan to the rule, the penny more or less rule from Thole, you reach the conclusion that we're advocating for, which is that I have no property, proprietary, or equitable interest in my colleague's 401K, even though we're participants in the same retirement plan, just as the defined benefit plan participant doesn't have any stake in any part of the plan assets. I do have a stake, however, in my own investment account. And so if there is an injury to my account balance because I invested in an imprudent fund that should never have been made available to me, then I can pursue that. I have Article III standing to do so. I get that argument, but how do I draw a principled difference between this situation and what we talked about in Hawksworth? Because clearly I don't have the interest that you've just mentioned in the funds that I'm not involved in in Hawksworth or Prudential. Because, I mean, your whole point is, look, basically if you have no shoes in the game, how are you going to represent anyone? But that's the same issue that arose there that we said was okay. Well, and I think the approach the first and second circuits took in those residential mortgage-backed securities cases is actually very helpful here, because what they said there was you look at what you would be proving in proving your own claim. And if what you're proving is also going to prove the claim of the absent class members, the kind of core of which evidence you're going to be presenting, would do that job as well, then you're a typical and appropriate representative. So in Hawksworth, if I proved that the deception I'm alleging occurred, well, that's good for the entire class because everybody is complaining of the same deception. But that's the difference here. If I prove that my bond fund was imprudent, I'm not proving that your equity fund was imprudent. And I think that's the key difference. The other point on Tholvitt I think is important is that it goes through each of the arguments that some courts have adopted for why ERISA standing rules are different. And that includes the argument that ERISA is based on trust law and that ERISA is kind of a representative action on behalf of the plan. And it's kind of similar to an assignment of a claim from the plan to the individual. And Thol goes one by one through each of those and says, no, that's not the way to think about it. And I would just argue that there's no way of distinguishing its logic on those points from the defined benefit context to the defined contribution plan context because it's the same cause of action in both cases. It's the same fiduciary standard in both cases, both types of plan, I mean. And so those arguments can't be any more successful here than they were in Thol. So would the problem be cured if there were named plaintiffs for the other plans? Yes, I think I would have to acknowledge that this particular problem would go away at that point. And that's why I think... Same counsel or different counsel? If the lawyers are the same? Yeah. I don't think that that would matter from our perspective. Judge Cowen, do you have anything, sir? Nothing, Your Honor. Thank you, Your Honor. Okay, thank you. We'll see you on the roll. Thank you. Your Honors, may it please the Court, James Miller for the appellees. I will step out of ERISA briefly, as my colleague did for most of his argument, for reasons that I think will become clear. Just to begin by discussing this Court's most recent pronouncement regarding typicality. I think it's important to emphasize that the 23F petition here is based solely on typicality grounds. And this Court, in the NFL concussion case, specifically stated that typicality is a low threshold and talked about a course of conduct that caused all sorts of different injuries and that could be proven in different ways. That is this Court's most recent pronouncement in a case that's akin to this kind of class action regarding typicality. And frankly, I just don't believe that the universal fiduciaries have a response to it. Now, stepping back into ERISA, one thing I think we should note here is that although this has been packaged as a typicality appeal, it's really a standing appeal. Okay, Judge Kearney denied the motion to dismiss on standing, and this is a way to challenge the point of standing in an ingenious manner, to give my friend credit. And I also give him credit for not suggesting that I should be terminated and not permitted to represent other participants in a case. But the reality with respect to standing issues is that Judge Sirica, in your Edmondson v. Lincoln National case, you went through an analysis about statutory standing in the ERISA context. Concrete injury means simply, as you explained, whether or not the plaintiff has been injured. Here, there is no dispute that the three plaintiffs in this case have adequately pled injury. And indeed, I should note that the universal fiduciaries acknowledge that all participants have pled injury because there's a claim for excessive record keeping and administrative expenses that is uniform and indisputably uniform for the entire class. Let me ask you a question on that. Yes, Your Honor. I think it is beyond question looking at the complaint that the excessive fees and administrative costs and so forth that that claim is uniform. That couldn't be the sole basis for the suit, right? No, Your Honor. But one thing that I think... I'm sorry, did I let you finish your question, Your Honor? Well, you answered my question. So now I'm going to ask you another question. So let's just put that aside. So when I think about what the language is, the uniform course of conduct, and I look at Hawksworth and Prudential, maybe it's that those claims are stated in a simpler, more straightforward fashion. But I'm having trouble with regard to the 37 funds and how I should think about this uniform course of conduct. Yes, Your Honor. I think if I can answer that in a few different ways. First, the allegation, and it's an undisputed averment and proof at the class certification stage, is that the consideration of each investment in the plan was considered both from a procedural and substantive prudence manner in the same way. So the proof would occur both with respect to procedural prudence and the substantive prudence of each investment in the same manner. In addition, the record-keeping claims and administrative expenses are not untethered from the investment management fee claims. The way that this plan funded record-keeping up until 2017 was through something called revenue sharing, which has been the subject of a lot of arrestal litigation around the country. And as a result, the amount that Fidelity was receiving in record-keeping fees affected both the returns that participants were receiving and touches upon the challenges that we referenced with respect to the excessive fees in this case. There's a footnote in our Second Amendment complaint talking about the concept of total plan cost. Total plan cost is the way that investments are evaluated by prudent fiduciaries where they look at the all-in cost, the investment management fee, the administrative fees, because in the end, the expenses that are paid by these participants obviously affect returns. If we go back to Judge Sirica's analysis in the Lincoln National case, after speaking about constitutional standing, then there's a discussion of statutory standing. And I think it's important because, as Judge Sirica explains in that opinion, one looks at the statute and simply says, does this plaintiff or do these plaintiffs have the right to bring the claims at issue? Here, importantly, the claims at issue are representative in nature. The entire structure of ERISA 50282 claims is that the plaintiffs are bringing the claims on behalf of the plan and that the losses that are achieved are returned to the plan. That is why Judge Kavanaugh specifically said in the Thole decision that the difference between defined contribution plans and defined benefit plans was of decisive importance. And virtually every court in this country, and we cite them all in our briefs, that has considered the issue of whether Thole impairs the ability of plaintiffs in a defined contribution plan to represent other participants who have other investments, has concluded that Thole does not The question really, after Thole, goes back to the Lincoln National analysis. Were our plaintiffs injured? There's no question the defendants concede that we have injury and we have statutory standing. Now, I can give you, I think it's helpful, I think, Your Honors, to look at an example where perhaps you would engage in a different analysis. There's a Second Circuit case that's discussed in the papers, Cooper versus Ruane Cunniff, which is, since I'm plaintiff's counsel in that case, I'm somewhat familiar with the facts. That is a case where there were challenges related to a profit-sharing account that was managed by Ruane Cunniff, an investment advisor, and they had discretionary control over that profit-sharing account. And then there were claims that were asserted with respect to normal 401k investments. Those normal 401k investment claims were not ultimately successful. But I would agree with my friend that if we had, in that case, it was not a unifying plan with a unified approach with respect to procedural and substantive prudence. What you had is half the plan was literally invested in valiant stock, unfortunately, for those participants by Ruane Cunniff, and half the plan was invested as a normal 401k. Of course you would not have constitutional or statutory standing to bring claims of that kind where you weren't invested in the profit-sharing account. I think the question really comes to, based on this Court's opinions with respect to typicality, and I think the Shearing-Plow decision is quite an important one. Shearing-Plow, I believe it was Judge Fischer speaking for the Court, identified ERISA class actions of this kind as paradigmatic examples of cases that should be certified, and spoke about typicality in the context of looking at questions related to the challenged course of conduct. And here, the way that we would prove procedural imprudence and substantive imprudence is exactly the same way. The other thing that I should say with respect to my friend's arguments regarding concrete stake, and whether or not our plaintiffs have a concrete stake with respect to the other investments in the plan, is to note that there's no discussion of the fact that these plaintiffs, in addition to seeking monetary relief, seek injunctive relief. They seek a change in way of practice related to the investments. And indeed, one could argue, for example, the investment advisor in this plan testified at deposition that they maintain a list of the best available investment in each category. That is not something that they generally share with their clients. They only share that list if and when there's a question about whether or not an investment should be maintained in the plan. One could imagine a circumstance where a court, Judge Kearney after trial, could order the fiduciaries of the plan to actually consider the best investment in the mind of their own investment advisor, who they're paying. That would inure to the benefit of all participants, including these plaintiffs. Because although they were invested in 7 of 30 or 7 of 37, the reality is that their choices are affected by the overall menu of investment options. Each choice they make is impacted by the other choices. If you have 35 bad investment options and you choose 7, you've still been affected by those 35 negative investment options. I think it's important in considering these issues to consider the representative nature of the claims at issue. When we think about this 7-30 split that your friend wants us to focus on, part of your reply would be as to the 30, there is a typicality because the plan participants in all 30 suffered an injury in fact. Exactly, Your Honor. And in fact, that point is conceded with respect to certain of the record-keeping claims already, which are inextricably tied to the investments because of the way that record-keeping was funded at least until 2017 for about half the class period. And then there was a change made. I know this is a down-the-line question, but if it turned out that the plan participants in 15 of the funds just pick a random number, didn't lose any money, would they still be part of the class because of whatever losses they suffered because of record-keeping and expenses? Yes, Your Honor. Or administrative expenses and so forth? Yes, they would still be part of the class because of those losses suffered and also under the latest restatement of trust, and I apologize Your Honor, I believe that Judge Guzman in the Eastern District of Illinois issued a decision yesterday speaking to this issue and I can obtain the citation for the court but under the law it is well established that because one plaintiff may have suffered losses that does not inure to the detriment in any way to another class member. You can recover for investment losses. There's not an offsetting circumstance where as a result a debit occurs to the other participant's account. So you would have certain participants who might not have found to have any losses with respect to certain investment claims. They would have their record-keeping claims. But the fact that other participants were not inured to the detriment of any participants that is why the Spano case is so distinguishable because there you had an over-broad class that admittedly was rife with class conflict. And in the Lockheed Martin case subsequently, Spano was distinguished as being an outlier case just like the few cases in this court around the country, none in this court, that have adopted the view that a participant in a plan doesn't have the ability to represent other participants. As your Honor pointed out in Fallick this was a participant who was representing other plans. Our firm has represented individual retirement plans on behalf of thousands of other retirement plans with respect to service arrangements and the like. Is part of your principle argument that are really the end of the inquiry and if we just follow our own case law that's basically... Absolutely, Your Honor. I think that in order to agree with the appellants here, the court would have to specifically disagree with this court's prior authority with respect to typicality and frankly I think we do a great disservice to Judge Kearney's order because despite some of the suggestions in the papers, he wrote a carefully considered 22 page class certification memorandum with 88 footnotes addressing every issue that was raised by the defendants. The third typicality argument that they raised the third and last is the argument that we're here to discuss today and I think that that speaks volumes about the confidence in which they placed that argument at least at the time that they were briefing class certification. I see I've gone over my time, Your Honor. I'm happy to answer any further questions and I apologize if I've been speaking too long. Judge Cowen? Yes. Are you relying too much on the Sweden ruling? Is Sweden distinguishable since it's clear that the plaintiffs in this case only invested in seven of the 37 funds? So in a way of speaking, as to 30 of those funds, you have no dog in the fight. Let's put it that way. Yes. Thank you, Your Honor. And I neglected to address Sweden. I think that in footnote 10 of Sweden, the court quite clearly indicates that standing exists because the plaintiffs in that case had only invested in two of the investments. So I think that Sweden actually comfortably supports our position. As the court will note in the appellant's papers, they rely more on Judge Roth's dissent in Sweden than they do on the majority opinion by Judge Rendell in Sweden. In addition, I should say that this suggestion that the plaintiffs only invested in seven out of 37 is a bit of a misnomer, respectfully, because here 13 of the investments are what are called target date funds. They were the fidelity freedom funds. And so a target date fund is a fund where someone, for lack of a better way of explaining it, says I'm planning on retiring in 2050. I'm going to invest in the 2050 version of the target date fund. As we plead in our complaint, and is in fact true, target date funds are only chosen on a family basis. So you choose one suite. So when they made that one decision and our plaintiffs invested in certain versions of those suites, they chose 13 of the 37. So it's a little bit of a misstatement to suggest that we're only invested in seven of 37 when 13 were chosen for the same reason. And then indeed in the defendant's brief, they treat all the funds the same. They speak in both their petition, as well as their appellate brief about the fact that at a point in time, I believe it was in 2020, they mapped the target date investments from the active suite to what's called the FIAM blend, which is a collective trust essentially, not completely, but essentially a collective trust version of the active suite. And they say, for purposes of convenience, we're going to refer to them all as the same. The reason they do is because they're treated as all the same. So I do believe, Your Honor, that we do rest on SWETA, but respectfully, I think that footnote 10 and the majority opinion in SWETA, as opposed to the dissent, strongly supports our position. Thank you. Thank you, Your Honor. Thank you so much. Thank you very much, Your Honors. Thank you, Your Honors. I'd like to start with the common course of conduct argument that is rooted in Hawksworth and all that, because I know that that's at the core of the court's thinking here. I just want to point to the district court opinion in Spano, which was then vacated, because that is exactly the argument that the district court in Spano accepted. They have the same rule that this court has, which is that when you're actually complaining about a uniform course of conduct, that's typical. But the Seventh Circuit rejected that application of that principle when you're challenging an entire plan's worth of investment options. And contrary to Mr. Miller's point about Abbott versus Lockheed Martin, which was authored by the same judge, Judge Wood, as Spano, the court didn't dismiss its earlier ruling as an outlier. It said that the plaintiffs in Lockheed Martin had complied with that principle, and they had limited the class to investors in the stable value fund that they were challenging. And so that still remains good law in the Seventh Circuit, and we think it should be followed here as well. I also want to discuss the conflict of interest potentially between participants and in particular with respect to the target date funds, because Mr. Miller points those out as a package deal, which in some ways they are, but that doesn't alleviate the problem, because when the plaintiffs are saying this alternative suite of funds should have been used rather than the Fidelity Freedom funds, well, some of those funds might be some of those, that alternative suite might be better in certain years of the target date series than in other years, and so they might pick the ones that are good for the named plaintiffs at the expense of people who are already retired or who are not going to retire for decades, because as the complaint notes, target date funds do change their strategy over time as the retirement date gets closer, because they become more conservative in investment strategy. Isn't that a flaw that should be dealt with sort of further down the line and not here at this initial stage? Well, no, because this is the final moment for certifying the, well, as it stands, it could be revisited, but the problem is that unless it is revisited, and there's no guarantee it would be, all of the class members are going to be bound res judicata by the judgment in this case. That's a significant point. I next want to turn to consider standing in this 23F appeal, and we cite the McNair v. Synapse Group case from this court, which said that standing is actually a necessary threshold issue even on a 23F appeal, and in that case, the plaintiff had standing to pursue individual monetary relief, but they were seeking class certification for prospective injunctive relief, and they did not have standing for that particular claim, and because standing has to be proven for each claim and form of relief sought, that class could not stand, and that's really the core error that district courts, with respect, are adopting when they find the full standing argument to be inapplicable. They are saying that the fact that they're standing for certain claims, like here the record-keeping fees, suffices for standing for other claims as well, and that runs counter to the Supreme Court's standing doctrine. And I see that I'm out of time. Unless the court has any further questions, we would ask that the class certification order be reversed. Thank you. Judge Cowan? No, thanks. Alright, thank you, counsel. Thank you, Your Honor. Wonderful argument, and we'll take the matter under advisement.